# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

SABRINA H.,[1]

                                 Plaintiff,

       v.                                   5:18-CV-730
                                                (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

STEVEN R. DOLSON, ESQ., for Plaintiff
HEETANO SHAMSOONDAR, ESQ., Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6)

## I.   PROCEDURAL HISTORY

Plaintiff protectively[2] filed an application for Supplemental Security Income

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

("SSI") on January 15, 2015. (Administrative Transcript ("T.") at 10, 55, 213-18). In her application, plaintiff alleged a disability onset date of June 1, 2009 due to cardiomyopathy, bipolar disorder, diabetes, and high blood pressure. (T. 213-18, 258). Her application was initially denied on May 5, 2015, and plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). On December 12, 2016, plaintiff appeared with her attorney, Karen E. Menter-Lowe, Esq, and testified at a hearing by videoconference before ALJ Roxanne Fuller. (T. 54). Cyndee Burnett, an impartial vocational expert ("VE"), also appeared and testified at the hearing. (T. 51-53). On June 21, 2017, ALJ Fuller found that plaintiff was not disabled from January 15, 2015[3] through the date of the ALJ's decision - June 21, 2017. (T. 10-27). Plaintiff requested a review of the ALJ's decision, which the Appeals Council denied on June 6, 2018. (T. 1-3.) ALJ Fuller's opinion thus became the final decision of the Commissioner.

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months….." 42 U.S.C. § 1382c(a)(3)(A). In

---

[3] Even though plaintiff states that her onset date is in 2009, SSI is not payable for any period prior to the month after the application is filed. *See* 42 U.S.C. § 1382(c)(7); 20 C.F.R. §§ 416.335, 416.501. The court does note that plaintiff has had a prior application for SSI benefits, alleging an onset date in 2006, which was denied at the agency level. Plaintiff ultimately received a remand from the federal court. (T. 86-88). This earlier application was denied again after remand. (T. 103-121). There is no issue regarding the previous application.

addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255,258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze ever piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ

cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

On the date of her administrative hearing, plaintiff was 41, single, and lived by herself. (T. 36-37).  She was a high-school graduate and had obtained a Nursing Assistant's certification ("CNA"). (T. 37).  Plaintiff had sporadic previous work experience as a cashier at Family Dollar; at Wal-Mart; at Rite Aid; and as a CNA. (T. 37-39).  However, each of these jobs lasted only for a period of months and sometimes only weeks. (*Id.*)  Plaintiff testified that she was unable to work because she had a lot of anxiety and a lot of depression. (T. 39).  She testified that she was "suspicious" of working with other people because she thought that they were talking about her, trying to make her lose her job, or did not like her. (*Id.*)

Plaintiff testified that she did not feel anxious leaving her house.  However, she became anxious being around people, even family members, and she also became anxious getting on the bus "because of all the things that's [sic] been going on and as far as like thinking that somebody might pull out a gun or a knife or something." (T. 40).  Plaintiff was in therapy and took medication for her mental impairments. (*Id.*)  She testified that her condition has gotten worse over the years.  She testified that when she discussed her worsening condition with her doctors, they "just" want to "talk it out." (T. 41).  Plaintiff stated that the medication made her drowsy, but that she really did not sleep very well, she was "up and down all night" once or twice per week. (T. 42).

Plaintiff stated that she was up all night due to fear that she was going to "see like monsters or ghosts or spirits," which she did not actually see, but she had "this fear in her mind" that she would see them. (*Id.*) For this reason, she slept with the lights on, and it was very difficult to get her mind off these things. (*Id.*) Plaintiff testified that this problem had also gotten worse, particularly since she started living alone. (*Id.*)

Plaintiff specifically testified that she did not think that she had any other impairments that would limit her ability to work. (T. 42-43). She stated that her heart was "okay," and she was getting her diabetes "under control." (T. 43). She stated that she took medication for these conditions, and that the only side effect was occasional nausea. (T. 43).

Plaintiff testified that, on a typical day, she got up, took her morning medication, made cereal or oatmeal for breakfast, got back into bed and watched television or talked on the telephone with her daughter in North Carolina. (T. 44). Plaintiff stated that she did not do "a lot," but would sometimes straighten up the house a little bit, which meant picking up "stuff" from the floor and "stuff like that." (*Id.*) She did not do laundry, dishes, or cooking on a "daily basis." (T. 44-45). She had some problems maintaining her personal hygiene, stating that she only showered once a week and brushed her teeth two or three times per week, "especially if I have to go out and do something." (T. 45).

When plaintiff did cook, she made "Ramen noodles." (*Id.*) She testified that she usually cooked those noodles "throughout the day." She stated that she did not cook every day, but when she did, she cooked enough for "a couple of days," including chicken or pork chops, hamburger patties, and some vegetables for dinner. (*Id.*) She

went to the grocery store by herself about once per month, and she stated that she had no difficulty shopping because she just went in and got it done. (T. 46). Plaintiff stated that it took her 20 minutes to shop for the whole month because she knew what she was going to buy, and she did it quickly. (*Id.*)

Plaintiff also testified that she was uncomfortable in "crowds," and that she considered a crowd to be three or four people. (*Id.*) She stated that she left the house "[s]ometimes once a day." Plaintiff had one friend who was "elderly," and for whom she ran errands such as going to the store. (*Id.*) Plaintiff had no trouble remembering to take her medication. (*Id.*) Plaintiff testified that she watched television and had no trouble following along with the programs. (T. 47). Plaintiff did have days, approximately two or three times per week, when she had trouble getting out of bed. (*Id.*) In response to a question by the ALJ, plaintiff testified that she "[got] around" by walking or by getting rides with her daughter, "[who' lives here and . . . has a car." (*Id.*) Plaintiff took care of her own finances. (T. 47-48). However, plaintiff was on Public Assistance and got Food Stamps, and "the cash part pays [the] rent and that's including utilities," so the only other bill she had to pay was her telephone bill. (T. 48). Plaintiff went to the store "down the street" from her house to pay the telephone bill. (*Id.*)

She testified that when she tried working at Family Dollar, she had a hard time focusing, particularly when the store got busy, and that she often had trouble counting the money in her drawer at the end of the day. (T. 49). A manager had to do it for her. (*Id.*) Plaintiff stated that the manager at Kentucky Fried Chicken did not like her, and she thought that "people were out to make [her] lose [her] job." (T. 50). It was difficult

for her to "keep up" when there was a crowd, and she had trouble concentrating on bagging items and "keeping things in order." (*Id.*)

Plaintiff enrolled in a "two-week class" at All Metro Field Service Workers. She was trying to obtain a health aide or personal aide position with the company. (T. 51). She stated that if you passed the test "you go into working," but that she only completed one week of the program, and she failed two tests in one day. (T. 50). She stated that she never actually worked for the company. (T. 50-51). She stated that she wanted to try again, but felt that she was not ready yet. (T. 51).

The ALJ heard testimony from vocational expert ("VE") Cyndee Burnett. (T. 51-53). In response to the ALJ's hypothetical question, the VE testified that plaintiff could perform three representative jobs in the national economy: assembler of small products; mail room clerk; and laundry worker. (T. 52-53). All the jobs involved light work, with additional physical restrictions. (T. 52). The ALJ also limited the plaintiff to simple, routine and repetitive tasks, in a low stress job, involving no contact with the general public, and only occasional contact with co-workers or supervisors. (*Id.*)

Finally, in response to questioning by plaintiff's counsel, the VE testified that if an individual were "off-task" twenty percent of the day or if the individual were absent from work four times per month, there were no jobs that the individual could perform. (T. 53).

## IV. **THE ALJ'S DECISION**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 15, 2015, the date of her application for SSI benefits. (T. 12). At

step two, the ALJ found the following severe impairments: coronary artery disease, hypertension, diabetes, depression, post traumatic stress disorder ("PTSD"), bipolar disorder, and borderline personality disorder. (*Id.*)  Plaintiff also had two impairments that the ALJ found were "non-severe:" obesity and migraine headaches. (T. 13).  At step three of the sequential analysis, the ALJ found that none of plaintiff's severe impairments, alone or in combination, met or equaled the severity of a Listed Impairment.[4] (T. 13).

At step four, the ALJ found that plaintiff had the physical RFC to perform light work, except that plaintiff could only occasionally climb ladders, ropes, or scaffolds; was limited to occasional exposure to moving mechanical parts and occasional operation of a motor vehicle; was limited to occasional exposure to unprotected heights; was able to perform simple, routine, and repetitive tasks; and was able to work in a low stress job;[5] was limited to no interaction with the public, and limited to only occasional interaction with co-workers and supervisors. (T. 15).  Based on this RFC, the ALJ found that plaintiff could not perform any of her past relevant work.  However, at step five, using the Medical Vocational Guidelines as a "framework," and the VE's testimony, the ALJ found that "there are jobs that exist in significant numbers in the national economy" that plaintiff could perform. (T. 26).  Thus, the ALJ found that plaintiff was not disabled. (T. 27).

---

[4] Plaintiff does not argue otherwise.

[5] The ALJ defined a "low stress job" as one which requires only occasional decision-making and has only occasional changes in the work setting. (T. 15).

9

## V.    ISSUES IN CONTENTION

Plaintiff raises one argument:

1.    The ALJ committed reversable error by failing to properly apply the treating physician rule. (Pl.'s Br. at 5-12) (Dkt. No. 9).

Defendant argues that the ALJ properly weighed the treating physicians' opinions and that the Commissioner's decision should be affirmed. (Def.'s Br. at 5-11) (Dkt. No. 13). For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision.

## DISCUSSION

## VI.    RFC EVALUATION/TREATING PHYSICIAN

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis…" A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F. 2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. At 183; *Sullivan v. Secretary of HHS,* 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

A treating source's opinion on the nature and severity of a claimant's impairments is entitled to controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" of the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). This is known as the "treating physician rule." In *Estrella v. Berryhill*, the court emphasizes the importance of a treating source's opinion in cases concerning mental impairments, as "cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence." *Estrella v. Berryhill*, __ F.3d __, No. 17-3247, 2019 WL 2273574, at *8 (2d Cir. 2019) (quoting *Garrison v. Colvin*, 759 F. 3d 995, 1017 (9ᵗʰ Cir. 2014)).

If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length,

nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 2019 WL 2273574, at *6-7 (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error. *Estrella*, 2019 WL 2273574, at *7. It is impossible to conclude that the error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

## B. Application

Plaintiff argues that the ALJ failed to properly analyze the mental RFC evaluations given by two of plaintiff's treating psychiatrists, Dr. Lyubov Leontyeva, M.D. (T. 323-29) and Dr. Mario Fahed, M.D.[6] (T. 741-45). (Pl.'s Br. at 5-12). Dr. Leontyeva and Dr. Fahed were both residents at the Upstate Medical University Psychiatry Department and treated plaintiff for several months each. Dr. Leontyeva treated plaintiff from July of 2014 until June of 2015, when Dr. Leontyeva left Upstate. (T. 1082-1277). Dr. Fahed began treating plaintiff in July of 2016, and it appears he was still treating her as of November 2016, shortly before the administrative hearing.[7]

---

[6] Dr. Leontyeva's report is entitled "Mental Impairment Questionnaire (RFC & Listings)" (T. 323), and Dr. Fahed's report is entitled "Mental Residual Functional Capacity Questionnaire." (T. 741). I will refer to both documents as RFC evaluations.

[7] Plaintiff had other treating mental health providers at Upstate in between Dr. Leontyeva and Dr. Fahed, but they did not complete separate RFC evaluations. Plaintiff saw Dr. Theresa Blatchford, M.D. on July 6, 2015. (T. 1278-82). Plaintiff was then assigned to Dr. Bonny H. Patel, M.D., another resident, who treated plaintiff from July 22, 2015 until June 30, 2016, when Dr. Fahed took over her

(T. 1489-1567).

Dr. Leontyeva's RFC evaluation is a "check-box" or "circle box" form, with some brief narrative statements, dated November 5, 2014. She circled a variety of listed symptoms, including poor memory, difficulty in thinking or concentrating, psychomotor agitation or retardation, social withdrawal or isolation, generalized persistent anxiety, recurrent panic attacks, mood disturbances, and several others. (T. 324). Dr. Leontyeva stated that plaintiff's symptoms would cause her to be absent from work *more than three times per month*. (T. 326). She listed as "fair" plaintiff's ability to remember work-like procedures; understand and carry out short, simple instructions; maintain attention for a two-hour segment; make simple work-related decisions; ask simple questions; request assistance; get along with co-workers; and respond appropriately to changes in a routine work setting. (T. 327). However, Dr. Leontyeva listed as "poor" plaintiff's ability to maintain regular attendance; work in coordination or proximity with others without being unduly distracted; complete a normal work day and work week without interruptions from psychologically based symptoms; perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; and deal with normal work stress. (T. 327).

Dr. Leontyeva rated plaintiff as "good" in the areas of interacting appropriately with the public; maintaining socially appropriate behavior; and adhering to standards of neatness and cleanliness. (T. 328). However, she rated plaintiff's limitations in activities of daily living as "moderate;" and in maintaining social functioning as

care. (T. 1282-1488).

13

"marked." She also listed deficiencies of concentration, persistence, and pace as "frequent." (T. 328). She also stated that plaintiff would have three or more episodes of decompensation in work or work-like settings which would cause plaintiff to withdraw from the situation or experience exacerbation of signs and symptoms "(which may include deterioration of adaptive behaviors)." (T. 329). Dr. Leontyeva also stated that plaintiff could not manage her own funds because she "gets behind [in] her bills which causes her extreme anxiety." (T. 329).

Dr. Fahed's mental RFC evaluation is dated December 7, 2016, after he had been treating plaintiff for approximately five months. (T. 741-45). Dr. Fahed saw plaintiff for "weekly therapy" and "medication management." (T. 741). In his check-box form, Dr. Fahed stated that plaintiff would be unable to meet competitive standards in remembering work-like procedures; maintaining regular attendance; and in responding appropriately to criticism from supervisors. (T. 743). She would be "seriously limited" in maintaining attention for a two hour segment; sustaining an ordinary routine without special supervision; working in coordination with others without being unduly distracted; completing a normal work day or work week without interruptions from psychologically based symptoms; responding appropriately to changes in a routine work setting; and dealing with normal work stress. (T. 743).

Dr. Fahed found that plaintiff had unlimited or very good abilities in the areas of understanding, remembering, and carrying out very short and simple instructions; performing at a consistent pace without an unreasonable number and length of rest periods; and asking simple questions or requesting assistance. (*Id.*) Dr. Fahed found

that plaintiff's ability was "limited but satisfactory" in the areas of making simple work-related decisions; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.*)

While Dr. Leontyeva found that plaintiff would have a "poor" ability to understand and remember even "detailed" instructions, Dr. Fahed found that plaintiff's ability was limited, but satisfactory in this area. (T. 327, 744). Dr. Fahed also found that plaintiff's ability to deal with the general public and maintain appropriate behavior was "very good." (T. 744). However, she was "seriously limited" in her ability to adhere to basic standards of neatness and cleanliness[8] and use public transportation. She had "no useful ability to function" in the area of travel to unfamiliar places. (*Id.*)

In the narrative sections of this form, Dr. Fahed states that plaintiff gets distracted and anxious when asked to perform and often fails "(eg: counting drawers)." (T. 743). He also states that plaintiff struggles with punctuality, exhibited by her "no-shows" or lateness to appointments. She takes criticism personally and has a hard time trusting co-workers. (*Id.*) Dr. Fahed states that plaintiff struggles following through with goals and plans and engages in avoidance, becoming suspicious of people when stressed. (T. 744). She also struggles with maintaining personal hygiene, only taking one bath per week, cannot imagine herself in unfamiliar places, becomes hypervigilant and fears for her safety. (T. 744). Dr. Fahed checked a box indicating that plaintiff's impairment would cause her to be absent from work approximately four times per month, and that plaintiff could not currently maintain full-time competitive

---

[8] It should be noted that Dr. Leontyeva found that plaintiff's ability in this area was "good." (T. 328).

employment, but "she might with therapy down the line." (T. 745).

The ALJ gave "little weight to Dr. Leontyeva's RFC evaluation, but only after a careful review of Dr. Leontyeva's extensive progress notes. Although the notes contained reports of ups and downs in plaintiff's mood, the doctor consistently reported only "moderate" symptoms. (T. 19-23). The ALJ reviewed each of plaintiff's treating physicians' reports, including the psychological evaluation performed upon Dr. Leontyeva's referral, by Ms. Karen Bonafide. (T. 20). There are hundreds of pages of treating physicians' notes. The ALJ did not engage in "cherry picking" the record. The ALJ even noted the plaintiff's visits to the emergency room, complaining of increased symptoms. (T. 21). For example, in June of 2015, plaintiff presented to Community General Hospital, complaining of suicidal ideation and depression, having experienced a manic phase for two days. (T. 21). However, the ALJ correctly noted that plaintiff had been taking more than the recommended dosage of her medication and ran out a week prior to the episode. (T. 21).

The ALJ discounted Dr. Leontyeva's conclusion that plaintiff would miss three or more days per month, and found that her opinion that plaintiff's "marked" difficulties in social functioning and "frequent" deficiencies in concentration, persistence, and pace were "overly severe." (T. 23). The ALJ also pointed out that RFC is an "administrative finding reserved to the Commissioner." (*Id.*) The ALJ stated that the evidence did not support that plaintiff had such functional limitations, particularly maintaining concentration and sustaining social functioning. (T. 23).

The court notes that the ALJ accurately described and compared the progress

notes in the record with the "overly severe" RFC evaluations. The treating physicians consistently reported that plaintiff's attention span, concentration, and memory were "intact," even though plaintiff did exhibit fluctuating moods, from depressed to "bright." (T. 402, 406, 421, 429, 444, 450, 504, 508 - Dr. Leontyeva; T. 1492, 1497, 1502, 1510, 1518, 1523, 1544, 1557 - Dr. Fahed; T. 1281 - Blatchford;[9] T. 1286, 1291, 1297, 1302, 1307, 1314-15, 1322, 1327, 1332, 1337, 1342, 1352, 1358, 1364 - Dr. Patel).[10]

On May 13, 2015, plaintiff met with Ms. Bonafide and Dr. Leontyeva. (T. 1241). Plaintiff reported that she had been denied disability and was worried about her finances. "However, she also started to look for a part time job, file many applications, and put together a resume." (T. 1241). On the same day, plaintiff's psychiatric examination showed mostly normal findings, with a "bright" affect, and reportedly good mood. She was "interactive," and her memory, attention, concentration, judgment, and associations were all listed as "normal," "good," or "intact." (T. 1244). The same psychiatric evaluation appears on Dr. Leontyeva's last treatment notes for plaintiff on June 3 and June 6, 2016. (T. 1268, 1272).

Dr. Leontyeva's "Transfer Summary"[11] stated that plaintiff was "now" on less

---

[9] Dr. Theresa Blatchford "covered" plaintiff's treatment in one visit in between Dr. Leontyeva and Dr. Patel. (T. 1278-82).

[10] These are representative samples of the treating physicians' reports of plaintiff's attention, concentration, and memory notations. As stated above, the treating physicians' notes span hundreds of pages.

[11] The June 2015 Transfer Summary was written because Dr. Leontyeva was transferring plaintiff's care to Dr. Patel, and was written several months after her RFC evaluation of November 2014, and also appears to indicate that plaintiff had somewhat improved after treatment. (T. 323-29,

medication, lost weight, completed psychological testing, was "consistent" with her appointment, and was able to state her emotions. (T. 1275). Although plaintiff was "depressed," her grooming and hygiene were both "normal," her memory and attention were "normal," her speech was normal, her IQ was average, and her thoughts were linear. (T. 1275). Dr. Leontyeva indicated that plaintiff had "sporadic employment," however, in a section entitled "Employment," Dr. Leontyeva noted that plaintiff was looking for a job and applying for disability. (T. 1276). Her "Leisure Activities" were listed as "socializing," "helping others," and "cooking." (*Id.*) Dr. Leontyeva stated that on a scale of 0 (not at all) to 2 (very much), plaintiff's symptoms affected her school and job - 2, affected her socially -1, and affected her family, home, and peers -1. (*Id.*)

Plaintiff was treated by Dr. Patel in between Dr. Leontyeva and Dr. Fahed, and the ALJ discussed Dr. Patel's treatment notes. (T. 22-23). Plaintiff admitted to Dr. Patel that she often used her medication in greater doses that prescribed. (T. 22). The ALJ noted that between December 2015 and early 2016, plaintiff "continued to manage her mental condition with the use of medication and therapy, with improved mood and decreased anxiety, but did occasionally express instances of increased anxiety based upon environmental stressors . . . ." (T. 22). The ALJ also noted that plaintiff's condition improved to the extent that she acquired jobs during the time of treatment, as reported by Dr. Patel. She also told Dr. Patel that she began attending church regularly, and "was involved." However, in May of 2016, she had some increased anxiety and "racing thoughts" and quit her job at Family Dollar, even though she reported that her

---

1274-77).

manager was willing to give her another chance. (T. 22).  The ALJ noted that records

from 2016 showed that plaintiff "continued to manage with the use of medication, but

**chose** not to return to work, and later expressed a poor mood due to depression at not

working." (T. 22) (emphasis added).

When plaintiff began treatment with Dr. Fahed, he determined her symptoms to

be in the "moderate" range, and his notes show that he continued to encourage the

plaintiff to participate in therapy, take her medications, and "improve her **ambivalence**

toward attempting to find a job." (T. 22).  As noted by the ALJ, from October to

December of 2016, plaintiff exhibited greater participation in therapy, with no

significant issues of anxiety or depressed mood. (T. 22).

With respect to Dr. Fahed's RFC evaluation, the ALJ repeated that RFC was not

a medical issue, and that, as with Dr. Leontyeva's RFC evaluation, it was not supported

by "the overall longitudinal record, as well as his own treatment notes, which do not

indicate such severe limitations . . . ." (T. 24).  The ALJ's findings are supported by

substantial evidence and do not violate the treating physician rule.  The ALJ clearly

recognized that Dr. Fahed, like Dr. Leontyeva were treating physicians, but did not give

their RFC evaluations "controlling weight."  The ALJ gave their RFC opinions little

weight, based on the entire record and their own internal conflicts.

Although not mentioned by the ALJ, the court also notes that, prior to completing

the RFC, Dr. Fahed sated as follows: "Most were filled out with input from patient as

**our work together does not address/evaluate <u>occupational</u> functioning**." (T. 743)

(underlining in original) (emphasis added).  With such an apparent disclaimer at the

beginning of Dr. Fahed's report, the ALJ was justified in giving this report little weight and focusing more on the multitude of progress reports in the record, written by the same physician and the reports of other treating physicians in the record.

The ALJ gave only "partial weight" to the RFC evaluation of a non-examining psychologist, Dr. S. Juriga, Ph.D. (T. 23). The ALJ correctly noted that she was not bound by findings of State Agency physicians, but that Dr. Juriga's findings were "largely consistent" with the medical evidence, which support only "moderate" limitations. (T. 23). The ALJ then found that plaintiff's functional abilities were greater than those found by Dr. Juniga. (*Id.*)

The ALJ also noted that Dr. Leontyeva and Dr. Fahed consistently assessed the plaintiff "with a GAF of 60, indicating only "moderate limitations." The Global Assessment of Functioning ("GAF") is a 100 point scale. A score of 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," 61-70 indicates "some mild symptoms," and 71-80 indicates that if symptoms are present, they are "transient" and "expectable reactions to psycho-social stressors," resulting in "no more than a slight impairment in social, occupational, or school functioning." American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th Ed. Text Revision 2000) ("DSM-IV-TR"). The GAF is no longer included in the most recent edition of the DSM. http://jaapl.org/content/42/2/173.

Plaintiff is correct in stating that the use of GAF Scores as a "reliable measure for disability determinations" has been questioned, and that GAF Scores may be used as opinion evidence, but present a variety of problems. (Pl.'s Br. at 8). Notwithstanding

that the GAF is no longer used in the DSM, it was the province of the ALJ to resolve the conflicting reports and make a determination that was consistent with the evidence of record. *See Wright v. Berryhill,* 687 F. App'x 45, 48 (2d Cir. 2017) ("the legal determination of whether an individual is eligible to receive disability insurance benefits is reserved to the Commissioner"); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing *Richardson v. Perales*, 402 U.S. at 399). *See also Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (the court must defer to the Commissioner's resolution of conflicting evidence).

Plaintiff argues that the GAF assessment of 60 was "a misreading of the record," and that although plaintiff's highest GAF was 60, the "actual" GAF scores were 55, and that a contemporaneous treatment note by Dr. Leontyeva indicates that the plaintiff's GAF was 52. (Pl.'s Br. at 7-9). A review of most, if not all of the contemporaneous treatment notes by all four psychiatrists who treated plaintiff shows that ***each*** report contains a GAF score of 51-60 listed on the report. Very few have actual individual scores, rather than a "range," and next to the GAF score range, the reports state "moderate symptoms." (*See e.g.* T. 402, 406, 421, 429, 444, 450, 504, 508 - Dr. Leontyeva; T. 1492, 1497, 1502, 1510, 1518, 1523, 1544, 1557 - Dr. Fahed; T. 1281 - Blatchford; T. 1286, 1291, 1297, 1302, 1307, 1314-15, 1322, 1327, 1332, 1337, 1342, 1352, 1358, 1364 - Dr. Patel). In any event, whether the GAF score was 52, 55, or 60, these scores all style indicate "moderate" symptoms. The ALJ did not rely on the GAF scores for her decision regarding "disability." The ALJ simply noted that the psychiatrists all assessed GAF scores as high as 60, indicating "moderate symptoms."

The ALJ clearly reviewed all the evidence of record in making that determination. Thus, the ALJ's mention of the GAF score was not error.

In *Estrella*, the court specifically considered and rejected the ALJ's use of the GAF Score. 925 F.3d at 98. The court held that

> '[u]nless [a] clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.' U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (Oct. 14, 2014). Furthermore, '[u]nless the GAF rating is well supported and consistent with other evidence in the file, it is entitled to little weight under our rules." *Id*.

*Id*. The court rejected the ALJ's reliance on the GAF rating to discount the treating physician's opinion because the physician's scores were "bereft of any explanation," and "unsupported by [his] other conclusions" as to the severity of the claimant's symptoms. *Id*.

In this case, almost every contemporaneous treatment report contains the GAF rating of 51-60, with the notation "moderate symptoms" written next to the score. Contrary to the plaintiff's argument, the ALJ did not give the GAF ratings "controlling" weight. After generally discussing Dr. Leontyneva's reports, the ALJ stated that "Dr. Leontyneva also assesses the claimant with a GAF of 60, indicating only moderate symptoms." (T. 23). The court also notes that Dr. Patel's treatment notes are consistent with moderate symptoms, and many of Dr. Patel's reports indicate that plaintiff was doing better. On December 3, 2015, Dr. Patel reported that plaintiff was pregnant,

going to church, taking care of her sister's children, and "doing better 'mentally,'" despite the stress." (T. 1361).

Although Dr. Fahed's RFC stated that plaintiff "struggles with maintaining personal hygiene (T. 744), and he generally notes in his contemporaneous progress reports that plaintiff has "fair" hygiene and grooming (T. 1502, 1528), the other treating doctors' progress notes do not generally indicate such limitations. Plaintiff's grooming and hygiene have been assessed as "normal." (*See* Dr. Patel's Transfer Summary dated June 30, 2016 - T. 1486). On September 9, 2015, November 9, 2015, December 3, 2015, and again on January 27, 2016, Dr. Patel found that plaintiff had "good" hygiene and grooming.[12] (T. 1322, 1352, 1369, 1402). The ALJ set forth "good reasons" for not giving controlling weight to Dr. Leontyeva's and Dr. Fahed's RFC evaluations because they were inconsistent with their own contemporaneous treatment notes,[13] GAF scores, and inconsistent with the other evidence of record, including reports by the third treating psychiatrist, Dr. Patel, who did not complete an RFC evaluation, but who treated plaintiff almost bi-weekly for approximately one year.

In *Smith v. Berryhill*, 740 F. App'x 721, 723-26 (2d Cir. 2018), plaintiff made a similar argument to plaintiff in this action. Smith argued that the ALJ's decision was not supported by substantial evidence because it rejected the "uncontradicted" opinions

---

[12] These are only some examples of Dr. Patel's many notes regarding plaintiff's "good" hygiene and grooming. (*See also* T. 1332, 1337, 1342, 1347, 1358, 1364, 1375, 1380, 1385, 1393, 1407, 1412, 1418, 1423, 1429).

[13] As stated above, Dr. Fahed's RFC evaluation began with a disclaimer stating that his work with plaintiff did not address or evaluate occupational functioning. (T. 743). Thus, it is not clear how any weight could be given to the evaluation when it was introduced with such a statement.

of his treating physicians, who opined that plaintiff would be off-task or absent for "significant portions of the day and month." The court found that such opinions could be given less weight when they are "contradicted by the weight of other record evidence," are undermined by their own treatment notes, internally inconsistent, or "otherwise uninformative." *Id.* at 724.

The court in *Sinopoli v. Berryhill*, No. 18-CV-6558, 2019 WL 3741051, at *9 (S.D.N.Y. May 31, 2019), *Rep't Rec. adopted*, 2019 WL 3734059 (S.D.N.Y. June 27, 2019), in another similar situation, held that "the ALJ was entitled to deem aspects of Plaintiff's treating physicians' opinions as critically flawed so long as those opinions were inconsistent with the doctors' findings and with other substantial evidence in the record." *Id.* (citing *Smith*, 740 F. App'x at 725-26). As long as the ALJ "explained what portions of the treating physicians' he found to be inconsistent, why he discounted them, and noted other substantial evidence that supported the weight given, he did not err in affording them little weight." *Id.*

In this case, as stated above, the ALJ cited extensively to Dr. Leontyeva's treatment notes in determining that her *one* RFC evaluation was not consistent with her other findings and specifically stated that "I must find her opinion to be overly severe, and thus give *it* little weight *in consideration of the RFC*." (T. 23) (emphasis added). The ALJ made the same findings with respect to the RFC evaluation submitted by Dr. Fahed. (T. 24). This court finds that the ALJ's explanation of why she gave little weight to the two RFC evaluations and her focus on the treating physicians' actual treatment notes was supported by substantial evidence and did not violate the treating

physician rule.

There is no question that plaintiff has limitations, that she has attempted several times to find work, and has been unsuccessful in maintaining employment once she finds it. However, the ALJ accounted for plaintiff's limitations in her RFC. The ALJ found that plaintiff was limited to performing "simple, routine, and repetitive tasks," performed in a "low stress" job. (T. 15). These restrictions would account for plaintiff's inability to perform complex tasks and would lessen the stress involved with her work. Plaintiff would be limited to only occasional decision making, only occasional changes in the work setting. (T. 15). Finally, plaintiff would be limited to no interaction with the public and only occasional interaction with co-workers and supervisors. (T. 15). Plaintiff's problems maintaining work often had to do with her issues dealing with co-workers. (T. 39-40). She testified that she had anxiety and depression, and that she was "suspicious of . . . working with people. Like thinking that they're talking about me or they are trying to make me lose my job . . . ."[14] (T. 39).

The ALJ's RFC took plaintiff's sensitivities into account by limiting her to only "occasional" interaction with co-workers and supervisors. Plaintiff had trouble with another job because she had trouble counting the money in her drawer at the end of the day. (T. 49). This type of activity would not be required in a job which was "low stress," and which involved only simple, routine tasks. Thus, the ALJ's decision was

_____

[14] Plaintiff did testify that she had one elderly friend, for whom plaintiff did errands as often as "once a day," such as going to the store for her. (T. 46).

supported by substantial evidence, and he did not violate the treating physician rule.[15]

**WHEREFORE**, based on the above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED** and the complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for **DEFENDANT**.

Dated: August 29, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

[15] To the extent that the ALJ did not exactly articulate the *Estrella*/*Halloran* factors, this court finds that a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Estrella*, 2019 WL 2273574, at *7.